UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| RONKITA P., o/b/o S.F., a minor,[1] | : | Case No. 1:25-cv-00202 |
| Plaintiff, | : | |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ORDER

Plaintiff filed an application for child Supplemental Security Income (SSI) on behalf of her minor son (Claimant) on March 31, 2021.[2] The claim was denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Claimant was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] Plaintiff previously filed an application for child SSI on behalf of Claimant, and the Commissioner found that Claimant was disabled beginning on March 7, 2013, due to developmental delays. After a continuing disability review, the Commissioner determined that Claimant was no longer disabled as of May 31, 2017. That determination was upheld by the ALJ assigned to this case in a decision dated October 1, 2019. (AR, Doc. No. 8-3 at PageID 93-117.) Plaintiff thereafter filed the current application.

Court to affirm the non-disability decision. For the reasons set forth below, this Court REVERSES the Commissioner's decision and REMANDS for further proceedings.

## I.  BACKGROUND

Plaintiff asserts that Claimant has been under a disability since January 12, 2010. On the SSI application date of March 31, 2021,[3] Claimant was a school-age child. 20 C.F.R. § 416.926a(g)(2)(iv). He was an adolescent on the date that the ALJ issued the decision. 20 C.F.R. § 416.926a(g)(2)(v).

The evidence in the Administrative Record ("AR," Doc. No. 8) is summarized in the ALJ's decision ("Decision," Doc. No. 8-2 at PageID 42-65), Plaintiff's Statement of Errors ("SE," Doc. No. 9), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 11), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 12). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II.  LEGAL FRAMEWORK FOR CHILD SSI DISABILITY DETERMINATIONS

The Social Security Administration provides SSI to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). An individual under the age of 18 is considered "disabled" for purposes of SSI "if that individual has a medically

---

[3] Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the SSI application is filed. Thus, the relevant period of consideration in this case begins on March 31, 2021. *See* 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is ... the date [the plaintiff] filed his protective application.")

determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of SSI benefits:

1. Is the child engaged in any substantial gainful activity? If so, the child is not disabled.

2. Does the child have a medically severe impairment or combination of impairments? If not, the child is not disabled.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a), and does the impairment meet the duration requirement? If so, the child is disabled.

20 C.F.R. § 416.924(a)-(d).

When determining whether the child's impairment or combination of impairments functionally equals any listing(s) in the Listing of Impairments, the ALJ will assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). To functionally equal a listed impairment, the impairment must result in "marked" limitations in two of the domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation means that the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is "'more than moderate' but 'less than extreme.'" *Id.* An "extreme" limitation means that the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## III.    STANDARD OF REVIEW

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "[W]hether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

4

(citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## IV.    FACTS

### A.    The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Claimant's application for benefits. In doing so, the ALJ considered the sequential steps set forth in the Social Security regulations for child SSI disability determinations. *See* 20 C.F.R. § 416.924. The ALJ made the following findings of fact:

Finding 1:   Claimant was a school-age child on the SSI application date, and he was an adolescent on the date that the ALJ issued the decision.

Finding 2:   He has not engaged in substantial gainful activity since the SSI application date.

Finding 3:   He has the severe impairments of mild asthma, post-traumatic stress disorder (PTSD), moderate to severe language disorder, and borderline/low average intellectual functioning.

Finding 4:   He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Finding 5:   Claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

In determining that Claimant's impairments are not functionally equivalent to a listed impairment, the ALJ found that he has:

- less than a marked limitation in acquiring and using information;
- less than a marked limitation in attending and completing tasks;
- less than a marked limitation in interacting and relating with others;
- less than a marked limitation in moving about and manipulating objects;
- less than a marked limitation in the ability to care for himself; and
- less than a marked limitation in health and physical well-being.

6

(Decision, Doc. No. 7-2 at PageID 46-60.) These findings led the ALJ to conclude that Claimant does not meet the definition of disability. (*Id.* at PageID 60-61.)

**B. The ALJ's Discussion Of Functional Equivalence**

After describing the applicable legal standard for the evaluation of functional equivalence, the ALJ summarized Claimant's reported symptoms and difficulty with school and daily activities. (Decision, Doc. No. 8-2 at PageID 48-51.) The ALJ also summarized Plaintiff's and Claimant's testimony at the hearing about his subjective complaints and difficulties at school and home. (*Id.* at PageID 50.)

The ALJ then addressed each of the six functional domains. (Decision, Doc. No. 8-2 at PageID 51-59.) After describing the factors for consideration of each domain based on Claimant's age as set forth in 20 C.F.R. § 416.926, the ALJ summarized some of the medical and other records and cited some of the subjective complaints that Plaintiff and Claimant reported. (*Id.*) As noted, the ALJ concluded that Plaintiff experienced "less than a marked limitation" in all six domains. (*Id.*)

For the first domain of acquiring and using information, the ALJ summarized the evidence and concluded as follows:

> The claimant's most recent *Individualized Education Program* (IEP) indicated that the claimant does well in discussions in a small peer group where information is read aloud, and he is able to answer orally (Exhibit B17E/4). BASC-3 testing performed by 2 of his teachers in 2023 identified atypicality, withdrawal, attention problems, and learning problems as areas of clinical significance (Exhibit B17E/6).
>
> The claimant's scores on the *Differential Abilities Scales-II* administer [sic] as part of his ETR on December 10, 2021 revealed scores ranging from low to average, with average scores in verbal and non-verbal, low score in spatial, and low average in general cognitive ability (Exhibit B17E/6). It

7

was noted that the claimant's disability impacts his ability to maintain the expected pace of work completion in all subjects, including tasks that involve lengthy reading passages, completion of mathematics tasks at a typical grade level speed is negative[ly] impacted due to a lack of fact fluency, and the need for more clarification of tasks and repetition of instruction to benefit from learning tasks (Id.).

His most recent IEP indicated that the claimant was receiving speech and language services to address receptive, expressive, and pragmatic language needs (Exhibit B17E/6). The claimant's scores on the Clinical Evaluation of Language Fundamentals (CELF-5), revealed a standard score of 81 which is slightly below the average range of 85-115 (Exhibit B17E/6). The claimant demonstrated strengths in vocabulary, word relationships, and with comprehending and creating simple and complex sentences (Id.). The claimant's weaknesses were comprehending sentences using spatial, temporal, or ordinal concepts, following multistep directions, and creating grammatically correct complex sentences using negation or various forms of conjunctions (Id.).

The claimant reportedly made nice progress on his goal on his expiring IEP, which was to comprehend and create complex sentences with embedded details in a variety of settings with 80% accuracy in 3 out of 4 targeted sessions (Id.). The claimant achieved 80% accuracy over his last two documented trials, and a present level screening used to collect data about the claimant's present functioning resulted in a score of 76% (Id.). It was noted that typical same age peers achieve 70% or higher on the measures (Id.). Based on these results, the IEP team concluded that the claimant no longer demonstrates receptive and expressive language deficits that impact his ability to participate in grade level discussion and understand grade level text (Id./7). They further indicated that the claimant's remaining needs do not rise to the level of requiring specialized instruction, and recommended dismissing speech and language services (Id.).

The claimant's most recent IEP outlined a number of accommodations, including breaks during testing, chunking assignments, extended time on testing, grace period on due dates, up to double the time given to general education students, the use of a graphic organizer, clarification on question[s], redirection, seating close to instruction, small groups, read aloud feature on all allowable state/district wide testing, and texts read in class in order to maximize comprehension (Id./24).

(Decision, Doc. No. 8-2 at PageID 52.)

8

Regarding the second domain of attending and completing tasks, the ALJ wrote:

When assessing post-secondary transition services in the claimant's most recent IEP, it was noted that the claimant needs prompting to return to task or continue tasks, and need[s] supports such as a calculator to be successful with basic computation (Exhibit B17E/13). When describing his strengths, the claimant was said to be generally liked by his classmates and to have thoughtful answers in group discussion.

The claimant['s] most recent IEP reported that the claimant struggles to complete work, even when give[n] supports (Exhibit B17E/12). Observations of his work binder revealed that his binder lacked organization and papers were randomly placed or not placed at all and may be in his locker or other locations (Id.). The claimant had not used his planner to keep track of assignments, and he had turned in less than 20% of his checklists signed, indicating he was not sharing his checklist with his parents (Id.). A review revealed similar goals on his previous IEP did not include any data for the 2022-2023 school year, with the goal having begun in February of 2023 (Id.). Data from September of 2023 noted that the claimant was more off task while in small groups (Id./13). October 2023 data notes that the claimant will not ask for help, but will take help in 3 of 3 observations when it is offered, and in 1 of those three observations the work was done to completion (Id.). It was noted that the claimant does best if the task does not involve extended independent reading (Id.).

BASC-3 testing performed by 2 of his teachers in 2023 identified atypicality, withdrawal, attention problems, and learning problems as areas of clinical significance (Exhibit B17E/6).

The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning.

(Decision, Doc. No. 8-2 at PageID 53.)

As for the third domain of interacting with and relating to others, the ALJ stated:

Early treatment notes revealed poor speech articulation, and what appeared to be a lot of saliva in the claimant's mouth when talking (Exhibit B9F/38). Treating providers at this October 2019 psychology visit indicated the claimant was difficult to understand due to articulation deficits (Id.). The claimant's behavior at this visit was described as "intermittently engaged" and responsive to interaction with the clinician but requiring some prompting at times (Id.). The claimant was noted to be drooling throughout

9

this visit. He displayed appropriate eye contact at this visit. His mood was euthymic and pleasant (Id.).

The claimant had a speech language consultative examination in connection with the instant claim on July 14, 2021 (Exhibit B4F). Speech Language Pathologist Ruth Quinn, SLP evaluated the claimant and interviewed his mother on the above date (Id./3). The claimant was a 6th grade student at Parker Woods Montessori School at the time of this examination (Id.). He did not have an IEP at the time of this assessment (Id.). The claimant's mother reported that the claimant met most developmental milestones on time with the exception of speech and language skills (Id.). The claimant scored in the 10th percentile with a standard score of 81 on the Arizona Articulation Proficiency Scale (AAPS). A w/r substitution and a distortion of the vocalic /r/ was noted. Intelligibility was judged to be good (Id.). On the CELF-5, the claimant had standard scores between 64 and 72, and scaled subtest scores between 1 and 9, with scores between 7 and 13 being the average range (Id./3-4). The claimant's subtest score of 9 in word definitions, and 8 in semantic relationship[s] were in the average range, with all others being below the normal range. Ms. Quinn assessed a moderate to severe language disorder based on her assessments. She recommended speech therapy to improve language and academic skills, and the development of an IEP was strongly recommended (Id.). Ms. Quinn stated that the claimant's current skills reduced his overall communication effectiveness and may negatively impact all areas of academics (Id.).

On the *Speech Evaluation Summary*, Ms. Quinn indicated that the claimant's intelligibility in known context, unknown context, and in conversation with request was 90% (Exhibit B4F/5). She further indicated that the claimant was stimulable for /r/ with verbal and positioning models (Id.). She noted the claimant's CELF-5 scores, including:

> Core Language Standard Score: 66;
> Receptive Language Score: 69;
> Expressive Language Score: 65;
> Language Content Standard Score: 72; and
> Language Memory Standard Score: 64

Ms. Quinn indicated the claimant's prognosis was good with increased intervention and estimated that duration of treatment would be throughout school years (Id.). She described adverse effects, noting that the claimant's communication skills negatively impact overall communication with peers, teachers, and family and negatively impact academic performance (Id.).

10

The claimant received treatment at Best Point Education & Behavioral Health beginning in October of 2021 (Exhibits B6F; B10F;B11F). The claimant's mother and his school referred the claimant for treatment after the claimant witnessed a robbery attempt that resulted in his mother being shot in front of their home (Exhibit B6F/3). The claimant refused to leave his mother's side after she was shot in the leg and tried to assist his mother in getting into their house, but he was too small (Id.). Treatment notes indicate that since his mother returned from the hospital, the claimant has been extremely worried about her and her safety (Id.). He reported difficulty sleeping. He slept on the floor in her room and checked on her constantly, including checking her breathing when she was asleep (Id.). The claimant startled his mother many times because she would wake up and he would be standing over her in the dark. The claimant reported being scared of losing his mother, and worries about suddenly losing her (Id.).

At the time of the initial intake examination, the claimant mental status exam revealed that he was well-groomed, cooperative, polite, withdrawn, and fidgety (Exhibit B6F/6). He avoided eye contact (Id.). The claimant's mood was anxious, and his affect was constricted (Id.). The claimant was estimated to be of average intelligence, with normal thought processes and thought content (Id.). The claimant's speech was normal, and his insight and motivation were described as average for his age (Id.). The claimant was in the 6th grade at the time of this encounter (Id.). Therapist Caroline Coates, LPCC diagnosed PTSD, and prescribed a course of treatment including counseling services provided at the claimant's school (Id./8).

The claimant's most recent IEP indicates that he gives thoughtful answers in group discussions (Exhibit B17E/10). The claimant's mother reported at the time of the IEP that the claimant keeps to himself at home, spending his time reading or on the computer (Id./6). She stated that the claimant does not speech [sic] much at home, which is consistent with his behavior in the school setting (Id.). The claimant's mother indicated the claimant is hesitant to ask for help because he does not want to be singled out for not knowing something (Id.). She further noted that the claimant does not speak up when others bully him (Id.).

The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning.

(Decision, Doc. No. 8-2 at PageID 54-55.)

11

The ALJ then addressed the fourth domain of moving about and manipulating objects:

> The claimant testified at the hearing that he has difficulty with buttons and cannot buckle his belt. He reported the ability to operate a keyboard, and video game controls. The claimant's mother testified that the claimant cannot ride a bike. She testified that he could attend to his personal care, such as brushing his teeth, without difficulty.
>
> November 22, 2019, assessment notes report that the claimant had an Occupational Therapy Evaluation for evaluation of Fine Motor Delay (Exhibit B9F/42). Areas of occupation were evaluated, noting some picky eating, and difficulty with opening food bags (cereal) (Id./43). Dressing concerns noted difficulty putting on a belt and buttoning a shirt (Id.). The claimant was reportedly able to tie his shoes and to don/doff his shirts and pants (Id.). Some difficulty with toothbrushing was noted, with the claimant report[ing] he does not like the taste of the toothpaste, or the feeling of the toothbrush in his mouth (Id.). The claimant's mother reported difficulty with the claimant rinsing his mouth and spitting it out appropriately without getting it onto his clothing (Id./44). The claimant was noted to pick his skin and bite his nails (Id.). The claimant's mother reported that the claimant is hesitant to participate in motor tasks such as riding a bike, scooters, and other outdoor activities (Id.). The claimant's mother reported that the claimant is able to make friends but is not very social with his peers (Id.).
>
> Objective findings on examination revealed that the claimant's range of motion, strength, and muscle tone were within functional limits (Exhibit B9F/44). There were no concerns reported or observed with respect to balance (Id.). The claimant was noted to be awake and alert, with impaired impulse control, and his parents reported difficulty responding to the feelings of others, difficulty in task persistence despite frustrations, difficulty controlling anger toward others, and reducing aggressive acts, and difficulty displaying the emotions appropriate for the situation (Id.). The claimant's insight and awareness were within functional limits, and his attention was impaired and distractable, with interest in self-directed activity (Id.).
>
> With respect to motor skills, there were concerns noted with avoiding activities due to difficulty with motor performance, coming up with an effective moving plan and difficulty learning new skills (Id.). The claimant's mother reported a history of difficulty learning new motor tasks, and will need repeated instruction on multiple occasions (Id.). The

12

claimant's mother reported that the claimant asks for help on tasks that she believes he should be able to complete independently (Id.). The claimant's mother completed a Developmental Coordination Questionnaire which was indicative of possible Developmental Coordination Disorder (Id./45). The claimant's physicality, following instructions, were within functional limits (Id.). His communication was notable for difficulty understanding his speech, speaking with a quiet tone of voice, and some difficulty understanding particular words (Id.). The claimant was noted to easily transition between activities and tasks and was cooperative and interactive throughout the evaluation (Id.).

Based on this evaluation, the claimant was diagnosed with lack of coordination and fine motor delay (Exhibit B9F/46). A course of occupational therapy once weekly for three months was prescribed (Id.).

The claimant had a Speech and Language assessment on November 26, 2019 (Exhibit B9F/49). The claimant was diagnosed with Other speech disturbance, and Expressive Language Disorder (Id.). The claimant's oral motor function appeared normal, but there was some indication of excessive drooling, so low tone was suspected (Id./50). The claimant's receptive language skills were within normal limits (Id.). His reading skills were also noted to be within normal limits (Id.). A course of Speech Therapy was recommended, with a good prognosis with frequent daily practice at home (Id./51).

Discharge notes from Best Point Education and Behavioral Health indicate that the claimant was discharged from care due to loss of contact with the claimant's mother, and noting multiple failed attempts to re-establish contact over a period between July 12, 2022 and August 16, 2022 (Exhibit B10F/1). The claimant's diagnosis was post-traumatic stress disorder, and directed the claimant's family to watch for the return of PTSD symptoms (Id./2). The notes further document among the claimant's strengths are intelligence and creativity, noting that the claimant makes his own movies and YouTube videos (Exhibit B10F/2). The claimant was further described as innovative, compassionate, and loving (Id.). The claimant[] reported connections to his mother, siblings, maternal aunt, his sister's father, going swimming, and his extended maternal family as sources of support (Id.). The claimant received services from November 30, 2021 to August 16, 2022, and was seen twice monthly (Id.).

Earlier treatment notes document care coordination and meetings in the home and school settings. For example, Caitlin Perazzo-Hermann ECMH, QMHS, met with the claimant and his sister at home on July 12, 2022

13

(Exhibit B10F/5). Ms. Perazzo-Hermann noted that the claimant was in a positive mood and had typical behaviors (Exhibit B10F/6). Ms. Perazzo-Hermann helped the claimant ha[ve] appropriate social interactions with his sister (Id.). She also assisted the claimant in identifying and processing his feelings (Id.).

On June 29, 2022 Ms. Caroline Coates, LPCC met with the claimant at school to work on his ISP BHC goals (Exhibit B10F/8-9). Upon arrival at the school Ms. Coates noted that the claimant appeared relaxed and calm (Id./9). The claimant was engaged and cooperative at this meeting (Id.). A brief mental status exam was performed at this visit and was described as unremarkable (Id./8). Earlier treatment notes document similar findings, with unremarkable mental status examinations, and noting that the claimant was cooperative, and that good progress was made (Id./ 17-18; 26-27; 29-30[]). At their April 29, 2022 meeting, the claimant was noted to have a positive mood, congruent affect, and typical behaviors throughout the session (Id./20). The care coordinator indicated that the claimant was redirected as needed, and she further noted that the claimant was able to identify and process his feelings at this visit (Id./21). She praised the client for following directions and asking for help when needed (Id.).

At his March 1, 2022 visit with Ms. Coates, the claimant was described as relaxed, calm, engaged, and cooperative (Exhibit B10F/48). At this visit, the claimant reported noticing that his mother does not seem scared anymore and is starting to let them play outside more often (Id.). The claimant further indicated that he was no longer sleeping on the floor of his mother's room and is once again sleeping upstairs in his own bed (Id.). The claimant also reported he no longer feels anxious on a daily basis (Id.). The claimant reported 4/10 anxiety at the highest, and this is when he feels lonely and worrying about the man who hurt his mother coming back and breaking into the home (Id.). The claimant was engaged throughout this session and responded positively to interventions (Id.). At his February 17, 2022 visit, the claimant reported sleeping better recently and sleeping in his own bed at night (Id.). The Care Coordinator documented a number of observations of improved social functioning in the classroom setting, including raising his hand to answer questions, and active participation in class (Exhibit B10F/60). She further noted appropriate social interactions with his peers (Id.). Other treatment notes were similarly positive, noting that the claimant was able to identify and process feelings when he became frustrated with his artwork, and despite these frustrations, he displayed appropriate social interactions with his peers (Id./63).

14

> The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning.

(Decision, Doc. No. 8-2 at PageID 56-58.)

> Regarding Claimant's ability to care for himself, the ALJ stated:

> Dr. Nelson noted that the claimant sometimes required reminders to shower or use deodorant (Exhibit B7F/9). He further reported that the claimant had fair ability to manage acute emotional extremes without significant or prolonged distress (Id.). Dr. Nelson reported that the claimant was generally aware of his mood states and could verbalize appropriate coping skills (Id.). He notes that the claimant's mother reported that the claimant asks for help at times when he needs it (Id.). Classroom observations suggest that the claimant does have some off-task behavior, but also documented that his on-task rate (76%) was similar to that of his peers (80%).

> The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning.

(Decision, Doc. No. 8-2 at PageID 58-59.)

> In the final domain of health and physical well-being, the ALJ wrote:

> The longitudinal record does not document any reports of generalized weakness or dizziness, recurrent infections, poor growth, bladder or bowel incontinence or pain that would support a finding of "marked" or "extreme" limitations with respect to this domain of functioning. The record does document some difficulty with coordination, and aversion to engaging in motor tasks such as riding bikes, scooters, and other outdoor activities (Exhibit B9F/44). At his occupational therapy evaluation, the claimant's range of motion, strength, and muscle tone were within functional limits (Id.). There were no concerns (reported or observed) with respect to balance (Id.). There was some indication that the claimant had difficulty picking up new motor tasks, and need[ed] repeated instruction on tasks before mastering them (Id.). The claimant's mother also reported that the claimant requests help for some tasks that she believes he should be able to complete independently (Id.). The totality of the evidence support [sic] a finding that the claimant's impairments result in a less than marked limitation in this domain of functioning.

(*Id.* at PageID 59.)

15

## V.	LAW AND ANALYSIS

### A.	Plaintiff's Request For Oral Argument

As an initial matter, Plaintiff requests oral argument to resolve the issues in this case pursuant to Southern District of Ohio Civil Rule 7.1(b)(2). (SE, Doc. No. 9 at PageID 737 n.2.) Defendant disagrees and asserts that oral argument is unnecessary. (Mem. In Opp., Doc. No. 11 at PageID 759-60.) The Local Civil Rules instruct that all motions will be determined without oral argument, unless specifically ordered by the Court. S.D. Ohio Civ. R. 7.1(a). A party may request oral argument if "oral argument is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. R. 7.1(b)(2). "Whether to grant or deny a request for oral argument is left to the sound discretion of the district court." *Dep't of Lab. v. Americare Healthcare Servs., LLC*, No. 2:21-cv-05076, 2024 WL 1406152, at *1 (S.D. Ohio Apr. 2, 2024) (Sargus, D.J.) (citing *Murray v. Moyers,* No. 2:14-CV-02334, 2015 WL 5626509, at *1 n.1 (S.D. Ohio Sep. 24, 2015) (Sargus, D.J.) (denying motion for oral argument); *Stolz v. J & B Steel Erectors, Inc.*, No. 1:14-cv-44, 2014 WL 6473413, at *1 n.1 (S.D. Ohio Nov. 18, 2014) (Black, D.J.) (finding oral argument unnecessary)).

Here, the parties have fully briefed the issues (SE, Doc. No. 9; Mem. In Opp., Doc. No. 11; Reply, Doc. No. 12) and the Court finds that the factual and legal issues are clear on their face. Therefore, oral arguments are not "essential to the fair resolution" of the issues before this Court and Plaintiff's request for oral argument is denied. S.D. Ohio Civ. R. 7.1(b)(2).

16

### B.      Plaintiff's Assignments Of Error

Plaintiff asserts two errors. First, Plaintiff contends that the ALJ "did not evaluate the evidence in accordance with Social Security's rules and policies." (SE, Doc. No. 9 at PageID 746-50.) Second, Plaintiff asserts that the ALJ's decision "is not supported by substantial evidence." (SE, Doc. No. 9 at PageID 750-56.) According to Plaintiff, substantial evidence shows that Claimant's PTSD meets or medically equals the criteria for Listing 112.15. (*Id.* at PageID 750-51.) Plaintiff also argues that substantial evidence shows that Claimant functionally equals a listing in the Listing of Impairments because Claimant is at least markedly limited in five of the six functional domains. (*Id.* at PageID 751-55.) For the reasons explained below, the Court concludes that the ALJ reversibly erred in her analysis of the functional domains. Therefore, the Court finds that portions of Plaintiff's asserted errors are well-taken and reverses and remands the Commissioner's decision. The Court instructs the ALJ to address all of Plaintiff's arguments on remand.

### C.      The ALJ Reversibly Erred When Analyzing The Functional Domains.

#### 1.      Applicable law

The ALJ's evaluation of functional equivalence is governed by a detailed Social Security Regulation (20 C.F.R. § 416.926a) and Social Security Ruling (SSR) 09-1p. *Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule-The "Whole Child" Approach*, SSR 09-1p, 2009 WL 396031 (S.S.A. Feb. 17, 2009).[4] For one or more impairments to functionally equal the listings, the "impairment(s) must be of

---

[4] Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

listing-level severity; i.e. it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a); SSR 09-1p, 2009 WL 396031, at *1. The regulation describes how the ALJ should determine whether a child has a "marked" or "extreme" limitation:

> (i)     [W]e will consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

> (ii)    The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

20 C.F.R. § 416.926a(e).

The factors in Sections 416.924a, 416.924b, and 416.929 include, but are not limited to: how well a child can initiate and sustain activities; how much extra help a child needs; the effects of structured or support settings; how a child functions in school; and the effects of medications or other treatment. 20 C.F.R. § 416.926a(a). When determining functional equivalence, the ALJ need not discuss all of the considerations set forth in 20 C.F.R. § 416.926a and SSR 09-1p. However, the ALJ must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p, 2009 WL 396031, at *3.

Thus, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of the SSA*, No. 3:21-CV-00129, 2022 U.S. Dist. LEXIS 175673, at *11 (S.D. Ohio Sept. 27, 2022) (Silvain, M.J.) (internal citation omitted). "This Court cannot uphold an ALJ's decision, even if there if there is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (cleaned up) (internal quotations and citation omitted). *See also Danyel P. v. Comm'r of Soc. Sec.*, No. 2:21-CV-02405, 2022 WL 1514170, at *6 (S.D. Ohio May 13, 2022) (Preston Deavers, M.J.) (ALJ's "inexplicable and illogical consistency" warranted remand); *Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00310, 2022 WL 17820565, at *3 (S.D. Ohio Dec. 20, 2022) (Silvain, M.J.) (ALJs must "provide a coherent explanation of [their] reasoning ... in order to provide sufficient rationale for a reviewing adjudicator or court"); *Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 WL 3762266, at *5 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the ground that "the ALJ's decision is internally inconsistent and incomplete").

> **2. The ALJ did not build a logical bridge between the summary of relevant medical and other evidence, and the conclusion of less than marked impairment in each functional domain.**

The ALJ reversibly erred by failing to explain how the medical and other evidence supported findings of less than marked impairment in all six functional domains. Because the ALJ's decision did not build a logical bridge between the evidence and the ALJ's conclusions about Claimant's functioning, reversal is required.

19

As shown above, the ALJ did provide a detailed summary of some of the medical and other evidence relating to each of the six functional domains. (Decision, Doc. No. 8-2 at PageID 51-59.) But the ALJ summarily ended her review of the evidence under each domain by stating: "The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning."[5] (*Id.* at PageID 52-59.) The ALJ did not meaningfully analyze the evidence or provide an explanation of *why* the evidence warranted a finding of "less than marked limitation" in each of the functional areas.

For example, in the first domain of acquiring and using information, the ALJ cited findings from Claimant's most recent Individualized Education Program (IEP) report that was completed in January 2024. (Decision, Doc. No. 8-2 at PageID 52 (citing AR, Doc. No. 8-6 at PageID 361-64, 380-81).) The ALJ discussed several findings that demonstrated Claimant's strengths in this domain (and so arguably showed less than marked impairment), such as Claimant's success in small group peer discussions, average scores in verbal and non-verbal abilities on the Differential Abilities Scales testing, and "nice progress" on a goal in his prior IEP,[6] which prompted the IEP team to conclude that Claimant no longer demonstrated receptive and expressive language deficits and so he no longer needed speech and language services. (*Id.*)

---

[5] For the sixth and final domain of health and physical well-being, the ALJ wrote: "The totality of the evidence support [sic] a finding that the claimant's impairments result in a less than marked limitation in this domain of functioning." (Decision, Doc. No. 8-2 at PageID 59.)

[6] The referenced goal was: "During language activities, [Claimant] will comprehend and create complex sentences with embedded details in a variety of settings with 80% accuracy in 3 out of 4 targeted sessions as measured by observation and checklists by the end of the IEP period. (AR, Doc. No. 8-6 at PageID 363; *see also* January 2023 IEP Report at AR, Doc. No. 8-6 at PageID 404.)

However, the ALJ also discussed several findings that demonstrated Claimant's weaknesses in this domain (and so arguably supported marked or higher impairment in this area), such as attention and learning problems on BASC-3 testing, low scores in spatial testing which "impacte[ed] his ability to maintain the expected pace of work completion in all subjects," and weakness with "comprehending sentences using spatial, temporal, or ordinal concepts, following multistep directions, and creating grammatically correct complex sentences using negation or various forms of conjunctions." (Decision, Doc. No. 8-2 at PageID 52.) Additionally, the ALJ stated that the IEP report set forth "a number of accommodations," such as:

> [I]ncluding breaks during testing, chunking assignments, extended time on testing, grace period on due dates, up to double the time given to general education students, the use of a graphic organizer, clarification on question[s], redirection, seating close to instruction, small groups, read aloud feature on all allowable state/district wide testing, and texts read in class in order to maximize comprehension.

(*Id.*)

After listing this evidence, the ALJ summarily stated: "The evidence of record supports a finding that the claimant has a less than marked limitation in this domain of functioning." (Decision, Doc. No. 8-2 at PageID 52.) The ALJ's conclusory statement does not provide a sufficient analysis of this domain, because the ALJ did not explain why the cited evidence—which shows several significant weaknesses in Claimant's ability to acquire and use information—supports a finding of less than marked, versus marked or extreme, limitation.

21

Similarly, in the domain of attending and completing tasks, the ALJ again cited findings from the January 2024 IEP report. (Decision, Doc. No. 8-2 at PageID 53 (citing AR, Doc. No. 8-6 at PageID 363-70).) But the ALJ identified relatively few findings that indicated Claimant's strengths in this domain and arguably supported the ALJ's conclusion of less than marked limitation. (*Id.*) The ALJ noted that according to the IEP report, Claimant "was said to be generally liked by his classmates and to have thoughtful answers in group discussion." (*Id.*) The ALJ also cited an October 2023 note that Claimant "[took] help in 3 of 3 observations when it [was] offered." (*Id.*) The rest of the evidence that the ALJ cited in this domain demonstrates Claimant's weaknesses and arguably supports a higher level of limitation. For example, although Claimant accepted help when offered on the three occasions in October 2023 that the ALJ referenced, the work was "done to completion" on only one of those occasions. (*Id.*) The ALJ also cited these findings from the January 2024 IEP report:

- [Claimant] needs prompting to return to task or continue tasks, and need supports such as a calculator to be successful with basic computation;

- [C]laimant struggles to complete work, even when give[n] supports;

- Observations of his work binder revealed that his binder lacked organization and papers were randomly placed or not placed at all and may be in his locker or other locations;

- [C]laimant had not used his planner to keep track of assignments, and he had turned in less than 20% of his checklists signed, indicating he was not sharing his checklist with his parents;

- Data from September of 2023 noted that the claimant was more off task while in small groups;

22

- [C]laimant does best if the task does not involve extended independent reading; and

- BASC-3 testing performed by 2 of his teachers in 2023 identified typicality, withdrawal, attention problems, and learning problems as areas of clinical significance.

(*Id.*)

Again, the ALJ did not explain her analysis of this evidence and instead summarily concluded that it "supports a finding that the claimant has a less than marked limitation in this domain of functioning." (Decision, Doc. No. 8-2 at PageID 53.) Again, the ALJ did not explain *why* the cited evidence did not demonstrate a higher level of limitation. The ALJ repeated this pattern in the remaining four domains of functioning and so did not provide sufficient analysis to support her conclusions in any of the functional domains. (*Id.* at PageID 54-58.)

The Court acknowledges that an ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023); *see also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004). Nevertheless, the ALJ must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." *Claudio v. Comm'r of Soc. Sec. Admin.*, No. 3:21-cv-1661-JRK, 2022 WL 6255608, at *15 (N.D. Ohio Aug. 5, 2022), *report and recommendation adopted sub nom. Claudio o/b/o E.P.I.C. v. Comm'r of Soc. Sec.*, No. 3:21 CV 1661, 2022 WL 4395399 (N.D. Ohio Sept. 23, 2022) (citing SSR 09-1p, 2009 WL 396031, at

*1). *See also Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (the ALJ's decision still must say enough "to allow the appellate court to trace the path of his reasoning"); *Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 U.S. App. LEXIS 1621, at *12 (6th Cir. Feb, 2, 1999) ("an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes"); *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 U.S. Dist. LEXIS 11925, at *12 (S.D. Ohio Feb. 8, 2011) (Barrett, D.J.) ("the ALJ's failure to articulate with specificity the reasons for her findings and conclusions 'deprives the Court of the ability to conduct any meaningful review'").

Here, although the ALJ provided a detailed summary of the medical and other evidence relating to each of the six functional domains, she did not explain *how* or *why* the evidence supports her findings of a "less than marked" limitation in each functional areas. (Decision, Doc. No. 8-2 at PageID 51-59.) Thus, this Court is unable to "trace the path of [her] reasoning." *Correa*, 2023 U.S. Dist. LEXIS 231766, at *31-32; *see also Claudio*, 2022 WL 6255608, at *15. The ALJ also did not explain "with specificity" why the objective and other medical evidence in the record supported findings of "less than marked" – and not "marked" or "extreme" – limitation in the functional domains. *Id*. The ALJ's failure to build a logical bridge between the evidence and her conclusions prevent the Court from engaging in meaningful judicial review and constitutes a reversible error. *See Blakley*, 581 F.3d at 409 (citing *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th Cir. 2004)).[7]

---

[7] Because the Court is unable to conduct a meaningful judicial review due to the ALJ's insufficient explanations, it does not decide whether the ALJ's conclusions are supported by substantial evidence.

24

**D.     The ALJ's Error Is Not Harmless.**

Generally, an ALJ's procedural error will be deemed harmless—and therefore will not be reversible—unless the claimant shows that the error prejudiced him on the merits or deprived him of substantial rights. *Rabbers v. Comm'r of the Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (quoting *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)). Here, the ALJ's failure to build a logical bridge that explains her decision to find less than marked limitation in all six areas of functioning prevents this Court from engaging in meaningful judicial review. This error is not harmless and reversal is therefore required. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 440 (6th Cir. 2018) ("[A]n ALJ's failure to follow agency procedures does not constitute harmless error when it prevents us from meaningfully reviewing his or her decision").

## VI.     REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is

25

lacking. *Faucher*, 17 F.3d at 176. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to Claimant's functioning in the six functional domains, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Claimant's disability claim under the required sequential analysis for child SSI to determine anew whether Claimant was under a disability and whether the application for child SSI should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. Plaintiff's Statement of Errors (Doc. No. 9) is GRANTED;

2. The Court REVERSES the Commissioner's non-disability determination;

3. No finding is made as to whether Claimant was under a "disability" within the meaning of the Social Security Act;

4. This matter is REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5. This case is terminated on the Court's docket.

*s/ Caroline H. Gentry*  
Caroline H. Gentry  
United States Magistrate Judge
